Good morning, Your Honors. Raytheo Chodas, or, thank you, Nancy Radin. And I'm glad to see that we're the only copyright case on your calendar this morning. This is a case that revolves around issues of similarity and access. The District Court granted summary judgment. We hope to persuade you that that was error.  There's trivial similarities, accidental or predictable similarities. Then there are substantial similarities, which we believe the District Court found here, although it didn't find all of them. And then there are striking similarities. When the similarities are sufficiently striking, they raise an inference of access. But the District Court here found that the similarities, though substantial, are not striking. We believe this was error for two reasons. First of all, as we argue to you in our briefs, plaintiff's script, quality of life, incorporates a constellation of expressive elements dealing with dark, comedic aspects of cancer. And that entire constellation of expressive elements found its way into the big C. But before I... Let me say this to you, which bothers me, because the piece that your client did, from all I know about cancer and middle-aged cancer and what people should do, followed really the way life should be. And I saw the five segments of the big C, and it followed what life should not do with serious illness. So I'm afraid that there are more contrasts. And by the way, for whatever it's worth, I thought the script was much better than the show, by the way, for whatever that's worth. But I felt there were many, many contrasts, and so I'm concerned about that. Thank you, Your Honor. Let me address that, if I may. Before I do, I want to finish the thought I was about to express, and I'll come back. All right. Do so. I'll not interrupt you again. No, that's all right. I'm glad to be interrupted. But when we're considering striking similarities, in this case and under the facts of this case, we have to consider what I want to call sudden similarities. The similarities are striking because they arose in a certain time period, suddenly, without explanation. And that's what makes them striking. Now, let me remind you of the feature of the fact pattern I'm talking about. The defendants have asserted loudly and stridently that they were working on a dark cancer comedy from early in 2008. By the end of July of 2008, they had prepared this treatment they called C is for Kathy. They filed it, or we had to file it, under seal. Obviously, it was produced in the course of efforts to resolve the case before it went further, and it was under seal. Anyway, C is for Kathy has certain elements in it, and if Your Honor had seen a TV show based on that, you would have liked it even less. In October of 2008, Plaintiff handed in her quality-of-life script to her writing class at UCLA. And two months later, out comes the big C. Now, Your Honor, you talk about the contrasts and the differences. I want to talk to you a little bit about the similarities which we listed for you in our brief. The biggest thing that happened between the end of July, the beginning of August, and January is that the lead character, who was a young woman in her 30s, having an affair with her sexy physical trainer, became in quality-of-life a mother of two difficult children, struggling with a separation from her husband. The entire dramatic focus shifted from the defendant's first treatment, which was about how this young, attractive, energetic, intelligent woman wants to continue to live her life with the knowledge that she now has a terminal cancer, shifted in quality-of-life, and then in the big C, to the drama about boundary issues, disclosure, privacy, living with relationships as this horrible knowledge creeps up on all concerned. When they first started this, which was to be the big C, what was the theme? C is for Cathy, was about the treatment at the end of July, Your Honor. Is that what you're asking me? Yes. That was exhibit filed under seal. That's about a woman who finds that she has the terminal cancer. So it is a cancer. Oh, no question it was a dark cancer. And she has an affair with her physical trainer? Yes. Of course, this woman later had an affair with a janitor on the big C. Yes, but she wasn't married. She didn't have children. Oh, you mean in the original one? In the original one. What happened was that all the- Counsel, one of the alternatives of similarities you listed was predictable, and it seems to me that a middle-aged woman with cancer, there's certain elements to that that are predictable. Difficulty in relationships, figuring out how much to disclose, whether to engage in treatment or not engage in treatment. So if you're going to have a story about a middle-aged woman with cancer, which admittedly 10 people can write them and not be infringing, it seemed to me that the bulk of both of them fell into that predictable realm. Well, Your Honor, I would have thought so too until I read further. Swimming pool, motor scooter, beach scene, things that an old woman who dies from something else, young student who needs special help, marijuana doctor, elements, Your Honor, no one of which is totally unheard of. But they, for the most part, play very different roles in the script versus the show, and there are a lot of things in the expression of this general theme that are quite different. The weird brother doesn't have an analog, and you've got the Minnesota wasp versus the California Jewish woman. I mean, there's a lot in the expression of it that is quite, quite different. There are differences, and, of course, we would expect differences in the derivative work. We would expect differences in additions in a 13-hour TV series or 13-episode TV series versus a 91-page script. But what we ask Your Honors to focus on is the shift in the treatment of the central ideas. So in your view, would it be enough to infer access simply because the original treatment had a young unmarried woman and it shifted to a middle-aged married woman? No, would the entire constellation of expressive elements in our view, which appears in Quality of Life, reappears in the script in the TV show in January unexplainedly? And I want to talk to you a moment about unexplainedly and why I think that's important also. The differences you speak of, there are some differences. There are many changes, of course. And a different kind of cancer in whether you're treated or not treated. I mean, there are huge differences. Well, yes, but part of the differences are dictated. They are sense of error for people making TV shows, which are different from people writing scripts. Well, that doesn't dictate whether the person decides to disclose or not or necessarily what kind of cancer they have, for example. Well, the drama in the original treatment was not about whether to disclose or how to disclose. It was in Quality of Life about that. The drama and the tension in Quality of Life all arise from the gradual painful disclosure. And that is the theme that was picked up in the TV series. Can I get to your position? It's simply this. A middle-aged woman faces these particular crises, disclosure, relationship with husband, relationship with children, relationship with doctor, relationship with friends. And what you're saying to me is that relationship was picked up by the TV series, but in a contrasting way. But the relationships were the gist of the changes. Not just the relationships, the swimming pool. Well, yeah. I think the swimming pool is important. It's a completely oddball feature of Quality of Life, which suddenly became the signature theme for the series. Well, I don't know about that. Well, it became the opening sequence for all the episodes. The motor scooter. Well, I didn't get that in the TV episodes there was a different kind of a scooter than the one that your client described. I thought she was describing one of those little scooters like I have for a disabled person where you go into a store or into a home. The scooter that the husband was driving is more like a motorcycle. I think it was in the script. A motor scooter, which was an emblem of activity and health in Quality of Life, adopted again into the big C. I think the district court was correct when it said that none of these one elements standing alone might have been enough to find copying, because no one of them alone might be protectable. But when all of them start appearing within a two-month period, unexplainedly, then our eyebrows are raised. And once our eyebrows are raised, an inference should be raised. Counsel, is there anything in the summary judgment record other than your contention of striking similarity from which one could infer access? Yes. There's all the evidence which the trial court called speculative and which we understand doesn't come up to the usual kind of access. There's all the evidence of connections between the UCLA writing program and the respondent creative community. We have, first of all, the fact that the scripts that Ms. Raiden submitted to her class were read by other instructors. Did you contact any of the instructors or do any investigation to try and create a link between UCLA and the people who wrote it? We were hired just before the summary judgment was heard.  And you didn't do any investigation? And did you schedule any depositions or attempt to get any information? We did not. We asked Your Honor to realize something. We do not believe if we take 400,000 hours of deposition that we're going to find somebody who says, oh, yeah, I took the script, I ripped off page one, and I told a member of Darlene Hunt's creative team all about the key elements. What I saw in the record, though, was just it had been submitted to UCLA instructors and there was no, nothing about any, not even a speculative chain where you could point to that would get it to Ms. Hunt. Not true. The chain is that Ernie Contreras, one of the instructors, works with Neil Morris, one of the producers who's friendly with Vivian Cannon. The chain is that Kathy Sandini And did you talk to any of those people? We didn't have a chance to before the summary judgment. We would if you gave us a chance. But whether they will admit it, we don't know. We doubt. What we would like to see, and I'll just finish the last two pieces, Kathy Sandini and Cindy Lieberman, the two executives, the dean and the administrator of the writing program, when Ms. Radin complained to them, said, yes, this has happened before, and your scripts were widely disseminated. I didn't see that language. What are you referring to? I don't have the exact exhibit in the record, but I cited it in the brief, that Kathy Sandini Other people can see this. I didn't see the language. Other people have complained about the same thing, and we will deal with you in the same way that we deal. But did they say this has been widely disseminated? They said that the scripts are widely disseminated. It is not clear exactly why. You don't have a sentiment. We don't claim, by the way. We don't have a story of A took it to B, who took it to C, who took it to Ms. Hunt. We know that. What we hope you will agree with us about is, unless Ms. Hunt comes forward with some alternative explanation of how the whole constellation of elements changed in the August to December time frame, the inference stands there unrebutted. Now, instead of coming up with- Well, it's not unrebutted because you have Ms. Hunt's declaration saying she has never seen the plaintiff or the plaintiff's script. That isn't rebuttal because she might not have known that it was the plaintiff's script. One of the members of her team might have read it and come to her with ideas. That's not rebuttal. Well, she says she wrote it all herself, and she explains where she got the ideas from for it. She does. It is a non-credible explanation, the birth of her beautiful baby, and, of course, whatever it was that inspired her to make the show. Well, we don't deal with credibility on summary judgment. This is unrebutted evidence at this point. Well, yes, but what rebutts it is that whatever it was that inspired her to make the show got her to see as for Kathy as late as August. That's the rebuttal. What she needed to produce and still would need to produce is all the e-mails she must have, but she redacted everything and didn't produce most of it, all the e-mails showing the discussion among her and her creative team between August 1st and December 31st. That would be persuasive evidence, but instead of producing that, she redacts things, she doesn't produce things, and she keeps on insisting stridently you didn't submit your thing until March of 2009, which even the district court saw was not true. Counsel, you're about out of time. I'm going to reserve for rebuttal. There's nothing to reserve, but we'll give you a minute because we've asked you a whole lot of questions. Thank you, Your Honor.  I wanted to ask you a question. Let him introduce himself for the record so we have it. That's okay, Your Honor. I'm Jonathan Zabin. I'll wait. For the defense. Yes, I'd be delighted to take your question. Well, I just mentioned Ms. Holmes' statement in the record, which she said I never had anything to do with this, but I notice there's no jurid on there. It's a statement that says it's subject to perjury, but it's not a sworn statement. I don't know if that's a procedure here in my circuit. With summary judgments, we require affidavit forms. Your Honor, I believe it is proper procedure in the Ninth Circuit. Okay. I'm going to rely on my Ninth Circuit partner for this because I didn't know you were a Second Circuit lawyer. I'll stop there. Your Honor, I want to try to say this politely. There's a difficulty here. Much of what the plaintiff's counsel said asserted as fact is simply not in the record, and this runs as a constant theme. He talks about Ms. Hunt's writing team. What's in the record is there was no writing team. A pilot was written by Ms. Hunt in 2008. It was submitted to Sony, with which he had a deal, which is in the record. It was then submitted to Showtime. Only after a show is started is there a team. There's no email. There's no team. There's nothing in the record regarding submission in 2008 to UCLA. Quite to the contrary, all of the evidence was in the sworn testimony, but Ms. Hunt, I'm sorry, Ms. Radin did not create her script until March 2009. Well, there's this rhetorical question in the brief, and Rady asked here, how did the show come to change from a single woman who had cancer and had an affair with her physical trainer, all of a sudden come to become a middle-aged married woman, very much like Nancy Radin's only life experience? Is there an explanation to that that you have in the record? There is no explanation of the day-to-day changes in the creative process, Your Honor. That is normal evolution. Some of the changes made it a little more similar to quality of life. Some of the changes made it less. All of the fundamentals, the idea of a dark cancer comedy, existed in July and August of 2008. It was changed from a single to a married woman who had nothing in common with Ms. Radin's married woman. They were completely different type characters. They had the same problems, but they had contrasting solutions. But the problem existed in 2008. It wasn't that the problem was created in the period of July 2007. The problem being dealing with cancer? They had terminal cancer. So that didn't change. The only change was the married status and children. The children were completely different. In Ms. Radin's script, the children are adults instead of the characters. In Ms. Hunt's script, she has one 14-year-old extremely difficult adolescent. There is no substantial similarity. With respect to substantial similarity, Mr. Chodos said the district court found substantial similarity. With all due respect, it did not. It specifically said it looked to see whether there was striking similarity. It found simply surface similarities of idea and specifically said it does not address the question of substantial similarity. I'm not a big television viewer, but do you recall any other television show or series which focused on a woman with terminal cancer or even a man with terminal cancer? Your Honor, I'm at a disadvantage. I'm not a large television viewer either. I am aware of some films that have done this. There's a very famous one with a famous actress where she's dying of terminal cancer. Much of the same issues involved. I'm not aware of television series specifically dealing with cancer. That doesn't mean there aren't any. I'm just not personally aware of them. I understand all of Your Honors have reviewed this material. I don't think there's any possibility of finding a substantial similarity at all. So how this changed between August and December is almost irrelevant because if there's no substantial similarity and certainly no striking similarity, the change is irrelevant. What is clear is there is zero evidence of access. Plaintiff's counsel is trying to read access out of the law as a requirement for copyright infringement. There is no widespread dissemination. And the various things that the plaintiff's counsel, again, said are in the record are not. With respect to what UCLA was saying, with respect to what was given to UCLA, there is no evidence whatsoever that a complete script of this was given to anyone before March 2009 or even existed. The plaintiff gave sworn testimony of the contrary. The plaintiff or the defendant? I'm sorry, the plaintiff, Your Honor, gave sworn testimony that the complete script was done just before she submitted it to UCLA. Oh, okay. I just want to be sure. She was already in competition. So what she's trying to do in this court, as she did in the district court, is undercut her own sworn testimony. Well, here's what bothers me about similarity. From a single woman, it metamorphosized to a married middle-aged lady, who has a husband, has children, and has friends who are also involved. Every one of those things were involved in Ms. Radin's script. And I know that's beyond what was some of what was argued, but those are the things that do impress me as similarities, and that's why I'm bringing them up. Your Honor, I would even concede that if those were the same in both, they are similarities. They aren't protectable similarities. They don't form a basis of a copyright claim. Because they're not specific enough to be a method or a domain. They're not specific. They're expression. They're merely ideas. Clearly, the idea of a married woman having children and having cancer is itself not protectable. Any one of us in this courtroom could right now go out and write a television show having a middle-aged woman who has cancer and has children, and merely doing that would not infringe either the Big C or Ms. Radin's script. Because those are clearly abstract ideas that are not protectable. Your Honor, I'd like to focus, if I may, for a moment on another aspect of this appeal, which is the denial of Rule 11 sanctions below. I'm well aware that courts are loath to grant Rule 11 sanctions against lawyers. I'm also well aware that the denial of Rule 11 sanctions is usually subject to an abusive discretion. Usually? When is it not subject to abusive discretion? If the standard is wrong, Your Honor. If the incorrect standard is used... What are you saying? If there's a legal error... There is a legal error here. Well, that's a type of abusive discretion, but I understand what you're saying. And, Your Honor, there is a clear legal error here that I think that this Court needs to address. We believe the sanctions are appropriate, that there was no investigation done in this case, that there's actually no evidence of access, and there's no possibility of striking similarity. Whether or not we're correct, however, what the District Court did in response to the application for sanctions was simply say we are not awarding sanctions for two reasons. One was that prior to bringing the complaint, that it was not clear that the action was meritless. And also, we're not awarding sanctions because the plaintiff believes so strongly in her case. With all due respect, that can't possibly be the standard for Rule 11. I'm not being facetious when I say it's almost a tooth fairy defense. What any lawyer would be able to say under that standard is my client believed so strongly in the tooth fairy that under Rule 11... Well, that only... Yeah, but that's not a plausible thing to believe in. Let's say you have a case involving race discrimination, and there's facts from which one might infer, maybe weakly, that such a thing happened and the client believes it. That's quite different than believing in something that can't exist. Well, Your Honor, I would agree with you, except for the fact this arises virtually to that point. What Your Honor just said was if there's a fact, facts could support it. There were no facts to support access here. Well, there are some similarities. The district court said they're at a quite abstract level. That may be right or it may not be right, but it isn't. Why is the district court wrong in saying that there are some similarities? I don't think there were. I think the court was right when they said there were abstract similarities at an abstract level. They didn't say there were substantial similarities or protectable. They said similarities at an abstract level, which I would agree with. But what the court said on sanctions was not there were some facts to support it. They simply said the client believes so strongly that, therefore, Rule 11 doesn't apply, which, in effect, writes Rule 11 out of the federal rules of civil procedure because the whole notion of Rule 11 is that there's a lawyer has an independent duty to ascertain that there's some factual evidence to support it. What's your best case for the fact that this Court will require a district court to sanction a lawyer under Rule 11 where the district court has chosen not to? Have we done that? Are you aware of that? Your Honor, I'm not asking you to require the court to do it. I don't think that would be inappropriate. You're asking us to correct that in Rule 11? I am asking you to correct the legal error and remand this to the district court and say that they can't consider as a factor what the client believed, that that can't be the standard. And also, there was clear error in understanding Rule 11. What the court said was that there was no reason prior to the commencement of the complaint or there was some basis prior to the commencement of the complaint. The court said it wasn't clear that the claims were unreasonable when the plaintiff brought suit because she wasn't aware of evidence that precluded her theory of access. Correct. And there was nothing wrong with that reasoning, correct? It's correct. The court was absolutely correct. What the court was incorrect on is Rule 11 requires more than that. What Rule 11 specifically says is there's a continuing obligation. And it's not just what you knew at the time you brought the complaint. It's when you later advocated it. The whole purpose of Rule 11. But the advocacy, what the district, as I saw it, what the district court was saying was the theory of access was similarity, striking similarity, and that that, even though it's wrong, was not so unreasonable as to support fees. That's how I read the gist of what the district court said. And, Your Honor, I don't think that's what the district court said. Well, that's fine. I would disagree. I think what the court said was that at the time the complaint was brought, there was, the lawyer bringing the complaint thought there might be a basis for access for UCLA because at that time what the complaint said was this was submitted to the UCLA competition. That was the only theory of access in the complaint. And that was the March 2009, right? That was the March 2009. And they found out about, the script was written in December later on. Exactly, Your Honor. But they then had a chance to withdraw this. That was the whole purpose of serving the Rule 11 motion. It created a 21-day safe harbor. They could investigate. They could see whether there now was a basis. Well, I'll tell you something. Access can be very hard to prove. And, you know, you mentioned how many writers and people around Holland. I just think that there's enough in this case to sustain the district court on sanctions. And I think also, from my own personal opinion, there are some similarities that are not that far off. They may not be enough to reverse, but there are similarities here. And I think your argument on sanctions is not, you can make the argument, but it's not going to be very convincing. Particularly, I think the sympathies have to be with the woman who had the actual cancer and not the one who played cancer. I understand the sympathy here, Your Honor. Now, with or without sympathy, I think you might take it from our questions that we're not easily disposed to your view of Rule 11 sanctions in this case. Are there any other issues? Well, the one thing I've liked on Rule 11, and it's going to be very quick, think of the consequences of the district court saying that if a plaintiff believes in his or her case, that eliminates the possibility of sanctions. And that's what that decision, how that decision reads. No, Your Honor, unless there are other questions. I think not. Thank you. Thank you. Mr. Charas, we used your time, but you may have one minute for rebuttal. Thank you. First of all, on the issue of the constellation of expressive elements, our opening brief at pages 12 and following lists the elements that we think were copied and explains where they appear in both of the two scripts. With regard to the use of a communications, it's our docket entry 48, exhibits 210, 11, 206, and 207, referred to on page 31 of our brief. I will take a cue from Mr. Zabin and speak about a topic I didn't address before the break, before I sat down, which is the attorney fee award. We hope you will. Counsel, that's not fair rebuttal because it wasn't raised. Oh, okay. We normally don't have rebuttal when. We don't waive it. No, we definitely never consider an issue waived just because it isn't argued orally. Enough then. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate very much the arguments of both counsel. They've been helpful in this interesting case. The case is submitted and we stand adjourned.
judges: Bright, Graber, Ikuta